Now here, argument number 21-1850, Nicino America versus Valent USA. Mr. Levine? Is it Levine? It's Levine. Levine. Thank you, Your Honor. That mistake's been made a few times. Whenever you're ready. May it please the court. Good morning, Your Honors. My name is Jordan Levine. I represent the plaintiff appellant, Nicino America. I'd like to reserve any time for rebuttal. Yes, I've reserved three minutes for rebuttal. Thank you. We are asking this honorable court to reverse the district court's opinion based upon the errors made in the opinion of last year. This case is about direct competitors in the agrochemical field. My client, Nicino, has sold its Centaur product for nearly 15 years and has worked very hard to develop a strong reputation in that mark. It owns an incontestable trademark registration for its mark. That mark is arbitrary and entitled to a broad scope of protection. Valent has now launched a directly competitive Centaur mark. The products treat the exact same types of products and pests in the same geographic markets. The timing of this argument today is important because Valent has still not meaningfully entered the market with its Centaur product. This is particularly true in California, which is both parties' largest market. So we're asking this court to reverse the district court's opinion and to enter a preliminary injunction against Valent's use of the Centaur trademark. The errors in the district court's opinion are fairly obvious in some ways. The court gave nominal attention to the significant law change that occurred in the beginning of 2020 with the enactment of the Trademark Modernization Act. That act made clear that the Supreme Court's decision in eBay was no longer applicable in trademark cases. What the law says is that a finding of likelihood of success in the merits results in a rebuttable presumption of irreparable harm, which is very important. In the district court's opinion, they- Do you have a number of law here or are you simply saying the district court misapplied the law? I think both, Your Honor. If you look at the district court's opinion, when they just- When it comes to the finding the facts and balancing the factors, that's all on clear error review. Yes. Okay. So what do you have here that you think is an issue of law that might get to know for review? Your Honor, as we try to make very clear in our papers, the district court relied on two factors for finding that the presumption of irreparable harm had been rebutted. The district court said that the evidence, the absence of actual confusion and the alleged sophistication of the purchasers rebutted the presumption of irreparable harm. Okay. Do you have a serious question about the second one before we get on to the first one? Yes, we do. Our serious question about the second one is that there is literally no case, no case in any circuit where a court has found that a plaintiff was likely to succeed on the merits of its case and a court used sophistication of purchasers as a basis for finding- I'm sorry. Is that an error of law or are you just saying the district court gave too much weight to this factor? I don't see how, I don't see any law that forbids them to take consumer confusion and sophistication into account. I agree with that. You have no case in any circuit. Before you agree with that, let me ask it this way. The irreparable harm prong of a PI analysis isn't really about harm, okay? It's just not. That's merits. Merits is about harm. The irreparable harm part is the focus on irreparable. You don't, you can have a great likelihood of success on the merits and have oceans of damages coming your way and not get a PI because you are not irreparably harmed because you've got oceans of damages coming your way. And so what happens is don't, under the irreparable harm, allege sophistication. That just shows that, hey, there's no damages. It doesn't show that the harm that I'm gonna experience is irreparable. And so to the extent that that is a question of law, not a question, the question of fact is, hey, how does that affect whether there's a harm? But isn't it a question of law as to whether a sophisticated buyer knows something, somehow makes it irreparable? I don't know how, irreparable is really focused on, I wanted to hold a parade on the 4th of July and now I have to hold that on August 5th. My rights are irreparably harmed because August 5th is not the 4th of July. That's what we give the irreparable harm to. It's not, can you hold a parade someday? So it strikes me that really your strongest argument is actual confusion and alleged sophistication go to harm. They don't go to irreparability. I think that's accurate, Your Honor. I think they do go to harm. And the reason the TMA was enacted specific to trademarks, I believe, is because irreparable harm as it relates to trademarks is extremely unique. Once the irreparable harm occurs, you can't undo it. Once the infringing product under, the infringing trademark is out there, you can't kind of undo that harm. Wait, wait, wait, look, look, that might be overbroad though, because let's just say that there's five consumers in the world of the product, right? If there's only five consumers and you have a totally infringing product, you can find out how many of those five consumers bought the infringing product and you can do damage. I don't think that's irreparable. We can find damage. But if it's something that would be at a grocery store in one of the aisles nationwide and we have no idea who bought the infringing product first, who didn't, then we begin to say, okay, that becomes irreparable because of the impossibility of calculating damages. And so it strikes me that the problem with irreparability, and maybe this is where actual confusion and sophistication go, is maybe this market's not that big. Maybe we can just find out who the buyers are, what they would have otherwise bought, and maybe damages is sufficient. But I don't think you can make a broad statement that just says every time there's a trademark infringement, it has to be irreparable. Some instances, if it's only five people, damages are fine. Understood, but also understand that this is a very large market where the sales are expected to be in the many tens of millions of dollars. And how many buyers do you think there are in this market? Thousands, Your Honor. There's testimony in this case that the defendant's product, like the plaintiff's product, are going to be sold to extremely large farms, but also can be sold to mom-and-pop farms that have less than an acre of farm. Counsel, it seems to me that the core of your beef is with this idea, you seem to think that the law carries forward something that means something different from an ordinary rebuttable presumption. I'm looking at 1116A. It says, a plaintiff seeking any such injunction shall be entitled to a rebuttable presumption of irreparable harm. Now, if we didn't have anything else to go on, we'd look at Rule 301 Federal Rules of Evidence. A presumption shifts the burden of production. It doesn't shift the ultimate burden of persuasion. Is there any reason to read rebuttal presumption 1116A any differently from that bursting bubble, shifting the burden of production, not shifting the burden of persuasion? Well, I think it's found in the precedent, Your Honor. Really, what precedent? Well, if you look at the long precedent prior to eBay. You cite a Third Circuit case or two, but this is a nationwide, this is a law that has to mean the same thing across the country. What precedent? Is there precedent from the Supreme Court that solidly established, Congress must have known about this and meant something different by rebuttable presumption here? I'm not aware of Supreme Court precedent, Your Honor. Didn't cite any, I didn't see it. So is there a robust, pretty uniform consensus in the courts of appeals that made rebuttable presumption mean you can only rebut this with, what, inordinate delay, I think you're arguing? That's exactly right. If you look at the precedent, certainly from the Third Circuit, Your Honor, as well as from- I don't see why we should be looking specifically at Third Circuit. This is about the meaning of a nationwide law. Sure, sure. So if you look at the Second Circuit, Your Honor, just as one example. The second and the third you're arguing about, do you provide, I didn't see a lot of authority from other circuits here. Well, if you look at other circuits, Your Honor, it has always been the case that when a likelihood of confusion is found, there is a rebuttable presumption of irreparable harm. In circuits like the Second, sorry, yes. No, but I think what Judge Bibas is asking is not so much about, he's saying it's a nationwide rule, therefore shouldn't we look to the broad general principles of 301 and not individual circuits and how they handle it? I mean, I guess your strongest argument in response could be that there's a circuit split. Some circuits follow the bursting bubble, some don't. The advisory committee notes disparage the bursting bubble theory, I believe. I seem to notionally recall that. And so what you would say is strangely, Congress enacted a law whose meaning was uncertain and would have to be variable based on how different circuits have assigned the 301 presumption shift. Is that what you're saying? Not at all. I think the Congress enacted this law to make clear that the eBay finding that a prevailing plaintiff on a likelihood of success in the merits needs to show actual evidence of irreparable harm. So what Congress did was say, no, eBay does not apply to trademark cases, was never intended to apply to trademark cases. That's what the second part of the law states. And therefore, you go back to the standard that was in place prior to eBay, which is that if a plaintiff shows a likelihood of success in the merits, they're entitled to a rebuttable presumption of irreparable harm. eBay says, if Congress means court to depart from long traditions of equity, it must expressly say so. Yes? Yes. And the act doesn't mention eBay. And there's nothing in the act that says we're departing from a long tradition of equity. Why don't we read the act against the background principles of injunctions and rebuttable presumptions then? Well, I think the law doesn't mention eBay, but I don't think... I'm sorry. It doesn't mention eBay, so? So I don't think, but I don't think you can read that law and not understand that it was enacted to directly deal with eBay, which had changed the standard in every circuit court, such that courts like Faring changed the standard in the Third Circuit to say, now you have to provide evidence of irreparable harm and that you don't simply get a presumption of irreparable harm. Okay. It created a presumption, but it doesn't tell us anything about what that presumption means. And we have to argue about, okay, does cost really mean you need inexcusable delay? Cost is just an example. That's one way to defeat it. Do you have any authority, because I didn't see it, that says inexcusable delay is the only way to show irreparable injury? No. We don't, Your Honor. So for example, a lengthy period of coexistence without evidence of actual confusion could be a factor as well. Okay. Delay is the most frequent one. Delay is one, but you admit there could be others. You have no basis for ruling others out. Conceivably, there could be others, but delay, if you look at the long history of cases in this circuit and elsewhere, delay is almost always the only basis for being able to rebut a presumption of irreparable harm. Okay, but none of them says others aren't allowed. It's just that's what you saw in the pattern of cases in the circuits. Significant pattern, yes, Your Honor. Does anyone have any further questions? You have any? No. All right, we'll have you back up on Republic. Thank you. Whenever you're ready, Mr. Cohen. Good morning, Your Honors. Thank you. May it please the court. My name is Bradley Cohen. I represent the appellee, Valent USA. Affirmance is appropriate for at least three reasons, Your Honor. First, on the irreparable harm, there was no clear error in the district court's findings. Second, the district court did not abuse its discretion in denying the preliminary injunction. And third, the evidence shows that Nichino is not likely to succeed on the merits. With respect to irreparable harm, the district court afforded Nichino the presumption that they were entitled to under the Trademark Modernization Act. They just found the presumption was rebutted. The district court was entitled to rely on the lack of actual confusion and the sophistication of the consumers in reaching that conclusion. Why? I mean, those points go to merits. There are lap factors that go to merits. Those points go to no harm, but I don't think they go to the nature of the harm is irreparable. I don't understand how sophisticated consumers somehow makes a harm that would have been irreparable now reparable through damages. So the question with irreparable harm, as Your Honor articulated, is the plaintiff likely to have an irreparable injury prior to trial? So one way that that might be assessed is whether or not if harm, if there's already been confusion, you might say, okay, well, we're seeing that there's already a harm to reputation that's taken place, but then there could be a possibility that there's some confusion going on that's unknown that's causing some harm to the goodwill that is happening before trial. But again, what we do is after the TMA, we have to give a presumption of irreparable harm. And so now we think, so once we show harm, we're going to presume that it's irreparable. And I guess my question is, okay, given that there's harm, right, how exactly do we know that this harm could not be remedied by damages? What do you have that shows that, no, the damages remedy won't work here? How is this less like a parade and more like damages is maybe one kind of metaphoric way of saying it. Well, the district court found that they didn't show that there was no evidence of a damage to their goodwill or a damage to the reputation or non-compensable harm. That's what the district court found. Like when you talk about the sophistication of consumers, so a sophisticated consumer in this case is more likely to know whether or not mistake has been made in the purchase and use of an insecticide and to report that. So that's why you could look at this situation, these particular facts and say, if there was an irreparable harm that was happening or likely to happen, a sophisticated consumer of agriculture insecticides is going to know a mistake was made. So it's both, it's less likely to be confused in the first place. And if they're confused, repeat players are more likely to pick it up quickly and dispel the confusion rather than remain confused based on a quick first impression. So it seems to go to both whether there's going to be a harm at all, which I'm not sure if Judge Meade is right, but also if the harm happens, how easy is it going to be to fix it or for them to pick up, okay, Centaur is different from Centaur. Yes, that's correct, Your Honor. These are certainly lab factors, but also the question, but with respect to the irreparability, the sophisticated consumer of an agricultural insecticide is going to know whether or not there's been a mistake as to purchase and use and going to be able to correct that or be aware of that. So again, I'm not trying to establish a point. That's an inference, right? That's an inference. You're sophisticated, therefore inference, you won't make the same mistakes. Sophisticated people make mistakes a lot. Like some lawyers will get case names or similar and they'll cite the wrong one or they'll talk about the wrong one. They're very sophisticated, they pass the bar. They're much like, you know, pest control advisors who are licensed and have all these things, but they can still, although being sophisticated, make mistakes. And the expert that I think you proffered recognized that sometimes since they're sophisticated, one of the things that they do is they look in databases and they begin typing in the database based on the spelling of the name. And sometimes the spelling of the name, they say, hey, look, when we type in C-E-N, we get a variety of products. Therefore, you know, they have to be sophisticated to pick the one that is centaur. But here, given the phonetic similarity of C-E-N and S-E-N, what if they accidentally typed in S-E-N, not C-E-N? And so even the databases that they use to hone their sophistication are built on basic understandings of phonics. And so the inference, the expert report seems to cut against the inference if the reason that they're so sophisticated is that they type in phonetic syllabics, syllables, and then generate database results. Yeah, well, as the district court pointed out, the similarity, the oral similarity is one thing, but in a situation involving agricultural insecticides, the product labels are very important. You've got to look at those product labels and review those product labels. And when you look at the product labels, the marks look very different. The evidence is that both of these are well-known companies. Their well-known company names are right on the covers there. There's a reason why there hasn't been any confusion in the record. Let's say you mistakenly bought one of them, right? You mistakenly bought Senstar instead of Centaur. You open it up, and Senstar's the one that's the jugs of liquid? That's correct, yeah. You open it up like, oh, I got jugs of liquid this time. I'm used to powder. So is there gonna be a feedback loop like maybe something went wrong here, or just assume, oh, Centaur has now moved to using jugs of liquid? What's that gonna look like given that you have sophisticated people ordering this stuff, but then maybe you have agricultural field hands actually applying it? Oh, well, again, Your Honor, there's not even evidence in the record of that mistake being made because there's multiple checks in the system with the retailers and with the pest control advisors and with the farms that they're not even getting to the point of, there's no evidence of any mistaken delivery, and in fact... But you keep coming back to no evidence, no evidence, no evidence. But even under 301, in the burden shift, there's a production requirement that you now bear, that your client now bears. And so, I mean, it strikes me as very strange to say, ah, I've met my burden of production because they have no evidence of confusion. I don't know that that's how you typically meet a burden of production, to say they have no evidence of confusion and that I give an expert report who knows a few things, and he says he guesses there might not be confusion, but he worked in the industry for a long time. The expert reports the strongest evidence you have of no likelihood of confusion, right? Well, your honors, that certainly contributes, for sure. I think there's testimony in Carlos Granadino's declaration, for example. But the burden of production, a lot of that relates to the sophistication of the consumers. Because again, the question of whether or not harm will be irreparable with respect to agricultural insecticides, when you've got a sophisticated marketplace, people who are careful not to make a mistake in purchase or use. If there were such a mistake, even as Nicino admits, the consequences are severe enough that you're gonna know if there was a mistake made. Or you'll know if you bought the wrong thing because their product has been sold for 16 years, it's a solid granule. Ours is a liquid. They're not even applied the same. So just walk me through why this isn't irreparable. We have a sophisticated consumer who makes a mistake. They buy the wrong product. So it's not so, they aren't so sophisticated that they always buy the right product. They're sophisticated that sometimes, like all human beings, they make a mistake. But now in their sophistication, what they return the product, they buy the right product. And so now we're gonna say, okay, there's no need for a preliminary injunction because they kind of self-corrected what they did wrong. The sophisticated, the market is so sophisticated that if they were to make the wrong purchase, if the product were to be delivered to the farm, they'd know instantly it's the wrong product because these are two totally different products. And so they'd know instantly and they'd return it. They wouldn't hold it against Nicino or hold it against Centaur. Or at most the damage to Centaur would be, we lost a particular sale as opposed to going forward, we're gonna keep patronizing Centaur. Yeah, or they wouldn't, that's correct, your honor. Or they wouldn't use it and then hold, they wouldn't use Centaur and then hold it against Centaur that somehow the product didn't work the way Centaur wanted it to, or Nicino wanted it to because they're gonna know that they're applying Centaur. But isn't one of the problems that maybe that they begin to like the new product more? You know, you sit there and say, hey, we're sophisticated. We got this one. Our field hands put the wrong one on and all of our beetles or whatever are gone now. And we liked it and we liked everything else about it. With agriculture insecticide, your honor, it doesn't quite work that way. And I think when you look, for example, at the declaration of Mr. Buckwalter, or even look at these labels, the level of sophistication when it comes to the crops and the pests and the use rates and the pre-harvest intervals, it's not just a preference of one pack of gum over another or one shampoo over another. These are biochemically very different products that can only be used in very specific ways so that there's no allowance for, oh, hey, I've just, I've fallen in love with Centaur, I'm gonna use that every time. Or I fell in love with Centaur, I'll use it every time. Because the products are so different. And this is where the sophistication comes in. And going through the label, you see for each different crop and for each different pest, there's different use rates, there's different pre-harvest intervals, there's different application instructions and so on. And that we haven't even talked about price, which is also a very significant factor. So their target market is farms with 1,000 acres or more. To buy Centaur for one application is to be in the range of $54,000 to $72,000 for one application of the product. And that's just to go at one pest and one season. You haven't even talked about other fertilizers or other pests. So there are, as they admit, there are reasons why farms exercise care with these particular products. So can I just ask one question? That makes sense, that that all proves that this is a sophisticated market. But am I right on the timing of this that the PI hearing took place before the Trademark Modernization Act was enacted? That's correct, Your Honor. And so if you knew that that act, if that act would have been passed, would you put more evidence in the record to show irreparable harm than you currently did or would you just rest on the record? Well, would the plaintiff have put in more evidence? No, no, since the burden of production shifts under the Trademark Modernization Act, would you have put in additional evidence of irreparable harm? Or would you just say, no, we're good with as it stands? Well, it's truly a hypothetical, right? But I mean, it might affect if this case gets remanded, you might say, hey, I'd like another crack at attacking the PI, because I didn't know that act was in place. I didn't make my burden of production because I didn't know I had a burden of production. I was following eBay and everything else. And so I guess my thought is, is there something else that you would have liked to put in if the case gets remanded because you kind of made a case and then the law changed on you? Yeah. And now your opponent's saying you didn't produce enough and you're kind of saying, well, I think my record's good. But in fairness to you and your client, you didn't know the law was going to change or it wasn't finalized. That's correct, Your Honor. When the briefs were submitted, the law was different. If this is remanded for further consideration by the district court, we would ask to submit additional evidence. That is correct, Your Honor. And the briefs were submitted even a year and a half ago. So even circumstances on the ground are not what they were at this time. So that is correct, Your Honor. Can a plaintiff ever persuade a court that irreparable harm is unlikely if the defendant has offered evidence of sophisticated buyers or do you look at that as an kind of insurmountable wall if you have a case where it is present? I would never draw a bright line. I don't think I'd draw a bright line at any factor. And, but certainly not with sophistication of consumers. I think that would depend on the product. Again, you could have a cosmetic that maybe costs $50 and the court might find, well, it's more of a luxury cosmetic and so people may take a little bit more care. But how much care are you gonna exercise for a $50 cosmetic versus a $54,000 application of an agricultural insecticide that your entire livelihood depends on the proper use and application of that product? So there may be some, even within the concept of a consumer that's gonna exercise care, there would be a range, I would say. And so I'm not sure I would draw a bright line rule, but I would say that in this particular instance with agricultural insecticides, we think that we're well beyond the line where a sophisticated- That gets us back to where we started. FIBA started this with, isn't this clear error review? And so you kind of just lean into clear error and say, I don't need a bright line rule, I just need to show no clear error. Well, we don't think there is, yes, that's correct, Your Honor. We don't think there has been a clear error, at least in, and actually for all the factors that are considered after the balance of the harms in public interest, it's all clear error for all of those. So we would say that there's not clear error there at all. Thank you, Counselor. Okay, thank you, Your Honors. Mr. Levine, I think you had three minutes, was it? Yes. Okay. Thank you, Your Honors. May it please the Court again. Picking up on the issue of clear error, one point that I do think is very important to make with respect to the District Court's opinion is with respect to the balancing of the lab factors, the Court determined that that factor was neutral because the SenStar product had only been on the market for a matter of months at the time we had the hearing in October of 2020. Then when you look at the Court's analysis of the issue of irreparable harm, they cite to no evidence of actual confusion and the sophistication of purchasers. However, when they mention the issue of actual confusion, the Court states that it weighs in favor, that it weighed in favor of Valen. So the finding that it made in the lab factor analysis and the finding it made in its discussion of irreparable harm are entirely inconsistent. And we think that the conclusion it made in its discussion of the lab factors is the correct one because the product had only been on the market for about three months and Valen's sales admittedly were only about 3% of what it predicted to sell in a fiscal year once the product was fully launched. So when you talk about clear error, there is no more clear error in the District Court's opinion than that. And for that reason, we think it's consideration of the issue of actual confusion in its discussion of irreparable harm has to be discarded entirely. So that does leave you with only sophistication as the only issue left that was perhaps properly considered. The overlap on the market again, we're talking nine months here, was it? At the time of the hearing, it was four months. By the time the Court ruled? By the time the Court ruled, it was about eight months, seven, eight months. And as to the issue of sophistication again, your honors, the law in the Third Circuit has long been that you need to consider the least sophisticated consumer. So it's not a question of whether these professional advisors are sophisticated. It's about the least sophisticated consumers. They're not making the purchasing decision here. They're not making the purchasing decisions correct, but they are encountering the product. And that is relevant. And we did submit evidence. How does that make them consumers? The person who's making the buying choice, in California, which is the lion's share of the market here, there's this licensing requirement such that it is in the hands of people who have a lot of expertise. That's true, your honor, but that's only in California. So that's about 50% of the market. Oh, I thought it was like 70, okay. It has turned out to be less than that. And even if it's 70%, it's still not the entire market. Yet, the district court focuses exclusively on California. The product at the time of the decision had not been launched in California. Actually, it's just now being launched a full year after the opinion in California. So there's- So are there any jurisdictions where the consumer is not licensed or otherwise kind of PCA professional? To my knowledge- I know we talk about owners, but I mean, I guess if you're an owner, you're already decently sophisticated. So is there any jurisdiction where these products are placed or marketed that you'd have someone other than a licensed professional or other sophisticated consumer? California is the only state where there is actually a specific licensor related to selecting insecticides. I thought the briefing said Idaho, Washington. I read about a handful of other states that had similar kind of what we call, ratcheting up a sophistication requirements for consumers. I don't think there's licensing requirements, but I believe that certainly it's going to be, there are consultants that are used that have a certain level of sophistication, but it is not all going to be what it is in California. So it is a very, very class in that sense. And I don't think- But no one's too unsophisticated in this class. I'm sorry? No one is too unsophisticated in this class. Everyone's working for a very important business. I think it goes back to the point you made, Judge Phipps, which is that even if you're sophisticated about selecting products, that doesn't necessarily, you're going to be careful about distinguishing between what are almost identical, phonetically similar trademarks. And I think that is really the problem here. And that's what then results in irreparable harm. I have one more question. So I'm looking at page 24 of Judge Stark's decision. He says, look, by the time I'm ruling these, they've only been on the market together for about nine months. You made this argument below. So yeah, I'm not tons of time for the confusion to play out. You say the sales are just 3.2% of projections. So, and it's hard to find because a lot of confusion is unreported. So it's not enough on its own. I acknowledge there's some issues here, but it's a brick in the wall. It's a piece of evidence. So the court saw your arguments, acknowledged them, put this in perspective. Doesn't that mean then that we are in clear error land in weighing this together with purchaser sophistication that's anticipated in California? Well, I think you are in clear error land because the court made error. If you're looking at page 24, it's the beginning of that paragraph where he says actual confusion weighs in favor of valent, which is inconsistent with his conclusion on page 17, where he says it was neutral. Wait a second. Let me go back to page 17. Okay. Page 17, I believe is where he discusses actual confusion in the context of the lap factors. Length of time, evidence of actual confusion. Neither party is aware of any confusion. The recent launch means, I can't say this definitively favors either side. Right. So it's neutral, which is an appropriate finding in a situation where the parties have only been on, but the products have only been on the market for a period, a very short period of time. In the staff. Is that a conflict? I don't know. All right. Is there anything else you guys want to say? No. All right. We thank both counsel for their able arguments. We will take the matter under advisement. And could I ask both parties to work together, split the costs and have a transcript compared to this argument.